UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
LAFAYETTE DIVISION

TIMOTHY B. SPISAK    CIVIL ACTION NO. 15-CV-02305

VERSUS       MAGISTRATE JUDGE HANNA

APACHE CORPORATION, ET AL. BY CONSENT OF THE PARTIES

## MEMORANDUM  RULING

Currently pending are the motion for summary judgment (Rec. Doc. 68), which was filed by the plaintiff, Timothy B. "Ben" Spisak with regard to the liability of defendants Eni US Operating Co. Inc. and Williams Field Services Group, LLC, and the cross-motion for summary judgment on the issue of liability (Rec. Doc. 79), which was filed by Eni and Williams.  The motions are opposed, and oral argument was held on March 23, 2017.  Considering the evidence, the law, and the arguments of the parties, and for the reasons fully explained below, this Court (a) denies the plaintiff's motion in its entirety, (b) grants the defendants' motion with regard to Williams's liability and dismisses the plaintiff's claims against Williams with prejudice, and (c) denies the defendants' motion with regard to Eni's liability on the basis that a genuine issue of material fact exists.

### BACKGROUND

This case arises out of an incident that allegedly occurred in May of 2015 aboard a fixed SPAR oil and gas production platform known as Devil's Tower, which

is located on the outer continental shelf off the coast of Louisiana. Devil's Tower has no means of propulsion and is connected to the seabed by a mooring system consisting of chains, cables, and piles or caissons embedded into the ocean floor.

Williams Field Services Group, LLC is the owner of the platform and Eni US Operating Co. Inc. is the operator. Apache Corporation is the owner of a well that was tied into Devil's Tower by pipeline. Apache and Stella Maris, LLC entered into a Master Service Contract, under which Apache hired Stella Maris to act as its company representative on the platform. The individual who performed that job was Brian Ray.

Apache and Greene's Energy Group, the plaintiff's employer, entered into a Master Service Contract in which Greene's contracted to perform certain work to support Apache's "onshore and offshore exploration and production business" as provided in subsequent job orders. Section 8 of the contract specified that Greene's "shall be, and perform at all times as, an independent contractor." At all times relevant, Greene's did not have a contract with either Williams or Eni for any work aboard Devil's Tower.

In the spring of 2015, Apache hired Greene's to flush out the Bass Lite pipeline from the Devil's Tower platform and prepare it to be plugged and abandoned. It was up to Greene's to determine what personnel and equipment it needed to do the job.

-2-

Greene's was responsible for rigging up and rigging down its equipment under the supervision of a Greene's supervisor who directed the Greene's crew. Greene's sent a crew of five men to Devil's Tower to perform the flushing operation, including Mr. Spisak who was employed by Greene's as a helper. The crew's supervisor was a Greene's employee, Matthew Breaux. Mr. Spisak reported directly to Mr. Breaux, and Mr. Breaux had ultimate supervisory control over Mr. Spisak's work.

The Greene's crew arrived at Devil's Tower on May 6, 2015. They barricaded off their work area with scaffolding and, sometimes utilizing the cranes aboard the platform and sometimes not, they rigged up their equipment and conducted the flushing operation. However, the line hydrated, which created an ice plug such that the flushing operation could not be completed. At that point, the Greene's crew had to rig down their equipment and prepare to disembark from the platform.

Mr. Spisak claims that he was injured on May 18, 2015, as the crew was rigging down their equipment. It is undisputed that there were cranes aboard the platform available for use by the Greene's crew. However, other contractors aboard the platform were also utilizing the cranes as simultaneous operations ("SIMOPS") were ongoing. Therefore, if the crane was in use by some other contractor, the Greene's crew would have to wait on its availability. The duration of the wait was not consistent. On the date of the alleged accident, the Greene's crew did not get

-3-

access to the crane for the rig down procedure, and for reasons not entirely clear on the record, the Greene's crew did not wait on the availability of a crane (which may not have been available until the next day) and conducted at least some of the rigging down procedure, including the movement of chicksan pipe, by hand.[1]

As Mr. Spisak and another member of the Greene's crew were carrying a ten-foot-long section of chicksan pipe within the barricaded area, Mr. Spisak allegedly tripped and was then pushed by the other Greene's employee on the opposite end of the pipe. Mr. Spisak may have tripped over some of Greene's equipment, either another length of chicksan pipe or a hose. It is undisputed, however, that he did not trip over any equipment that was owned by Williams or Eni.

According to the incident investigation report, Greene's employees who were interviewed stated "they had to move the material manually because divers were below and *the rig* did not want to make the lifts with them in this position. When the divers would move out of the way *the company* would use the crane for their own use, leaving Greenes [sic] without the use of the crane." (Emphasis added). The Court is left with nothing to indicate who "the rig" is and whether that entity is different from "the company."

---

[1]    There is some evidence that an attempt was made by some Greene's employees to exercise stop work authority; however, other evidence indicates that they, along with Mr. Ray, collectively decided not to wait. This in and of itself is a genuine issue of material fact.

Eni, as the operator of the platform, employed the Offshore Installation Manager ("OIM") whose job it was to oversee all operations on the platform and to ensure that all operations were run in a safe manner. John Randall held the position of OIM, and he had the "ultimate work authority" on the platform including who would have access to the cranes and when. The coordination of the contractors' work through a collaborative process amongst the various supervisors so that each contractor could have access to a crane when needed was also part of the responsibility of the OIM. However, that is where the evidence is in conflict.

Mr. Ray testified initially that "someone in the control room" with Eni would be the person to talk to in order to get access to the crane. He then testified that he didn't go to Eni because "they wasn't doing any crane work." When Mr. Ray needed access to a crane, he testified that he went to the inspector for another contractor, DGE (Deep Gulf Energy) who also owned a well on the platform – presumably occupying a similar position as Apache. Jim Leger, a Siren employee who acted as a liaison for Eni, testified that Willie Bergeron who worked for DGE was the "big kahuna" who decided when and if Greene's could use the cranes. Danny Bergeron, who worked for DGE's subcontractor Performance Energy, was identified by Mr. Leger as the person who "for the most part" made decisions on crane access. Matt Breaux testified that the riggers were in charge of the crane, yet he did not know who

employed them.  While Mr. Leger indicated that if Willie Bergeron wanted the crane, he got it because "it was Willie's crane," the evidence does not establish who actually made the decision on crane access at any particular time.   Nevertheless, it is undisputed that Eni had the ultimate work authority on the platform, which included coordinating crane access.

On the day of the plaintiff's accident, Mr. Breaux completed a job safety analysis ("JSA") to which was attached a Unit Work Permit that was signed off on by Eni as the OIM.  The evidence establishes that, after the line hydrated, a subsequent JSA was executed prior to the rig-down that included language concerning the use of a crane.  However, the second JSA was not signed by anyone with Eni, nor was a separate Unit Work Permit executed.  Mr. Breaux testified that Greene's was essentially denied access to the crane at the time the rig down began by "the riggers" but it is not clear by whom these people were employed, i.e. whether they were Eni employees, DGE employees, or somebody else's employee.  It is also unclear whether the coordination of the use of the crane was conducted as indicated by Mr. Randall, why the use of the crane was delayed, how long the delay would have lasted, and whether the delay was of sufficient duration that a stop work order could have and should have been issued until coordination of the use of the crane could

have been undertaken.[2]  However, it is undisputed that coordination of crane access did not occur when the job changed from flushing the line to rigging down.

Williams did not have any employees on the platform at any time during the flushing project, and Williams did not exercise any control over the details of the work performed by Greene's.  There is no evidence that anyone with Williams directed the Greene's crew to move the chicksan pipe by hand, or that Williams was even aware that the operation was being undertaken in that manner at that time. While the plaintiff alleged that Mr. Ray of Stella Maris ordered the plaintiff to carry the pipe by hand, there is no evidence that anybody from Williams did so, or that anybody from Williams provided any other instructions in rigging down or moving the equipment.  In addition, there is no evidence that Greene's was told by anyone with Williams that Greene's could not use the crane or that anyone with Williams had anything whatsoever to do with the use or operation of the crane.  Finally, there is no evidence that any equipment on the platform, or the platform itself, was in any way defective or that any condition of the platform or its appurtenances contributed to the plaintiff's accident.

---

[2]     The Court notes that a seemingly important part of the testimony found at Page 62 of the deposition of Mr. Breaux (Rec. Doc. 79-6 at pp. 9-10) would have shed some light on this issue; however, it was not included in any party's submissions concerning these motions.

## APPLICABLE LAW AND ANALYSIS

### A.  THE SUMMARY JUDGMENT STANDARD

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is appropriate when there is no genuine dispute as to any material fact, and the moving party is entitled to judgment as a matter of law.  A fact is material if proof of its existence or nonexistence might affect the outcome of the lawsuit under the applicable governing law.[3]  A genuine issue of material fact exists if a reasonable jury could render a verdict for the nonmoving party.[4]

The party seeking summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those parts of the record that demonstrate the absence of genuine issues of material fact.[5]  If the moving party carries its initial burden, the burden shifts to the nonmoving party to demonstrate the

---

[3]     *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 326 (5th Cir. 2009); *Hamilton v. Segue Software, Inc.*, 232 F.3d 473, 477 (5th Cir. 2000).

[4]     *Brumfield v. Hollins*, 551 F.3d 322, 326 (5th Cir. 2008) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. at 252; *Hamilton v. Segue Software, Inc.*, 232 F.3d at 477.

[5]     *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

-8-

existence of a genuine issue of a material fact.[6]  All facts and inferences are construed in the light most favorable to the nonmoving party.[7]

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by pointing out that there is insufficient proof concerning an essential element of the nonmoving party's claim.[8]  The motion should be granted if the nonmoving party cannot produce evidence to support an essential element of its claim.[9]

## B.  LOUISIANA LAW GOVERNS THE CLAIMS AGAINST WILLIAMS AND ENI

Jurisdiction in this case is premised on the jurisdictional provision of the Outer Continental Shelf Lands Act ("OCSLA").[10]  As set forth in this Court's memorandum ruling on the motions for summary judgment concerning the applicable substantive law, pursuant to OCSLA, the law of Louisiana, as the adjacent state, governs the plaintiff's claims against Williams and Eni as the controversy arises on a situs

---

[6]  *Washburn v. Harvey*, 504 F.3d at 508.

[7]  *Brumfield v. Hollins*, 551 F.3d at 326 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986)).

[8]  *Norwegian Bulk Transport A/S v. International Marine Terminals Partnership*, 520 F.3d 409, 412 (5th Cir. 2008) (citing *Celotex Corp. v. Catrett*, 477 U.S. at 325).

[9]  *Condrey v. Suntrust Bank of Ga.*, 431 F.3d 191, 197 (5th Cir. 2005).

[10]  43 U.S.C. § 1349.

covered by the OCSLA, maritime law does not apply of its own force, and Louisiana law is not inconsistent with federal law.[11]

The plaintiff's claims against Eni are negligence claims based on Louisiana Civil Code Article 2315. Under Louisiana law, a duty-risk analysis is used to determine whether liability exists in negligence cases. "Under this analysis, a plaintiff must prove five separate elements: (1) the defendant had a duty to conform his or her conduct to a specific standard of care; (2) the defendant failed to conform his or her conduct to the appropriate standard of care; (3) the defendant's substandard conduct was a cause-in-fact of the plaintiff's injuries; (4) the defendant's substandard conduct was a legal cause of the plaintiff's injuries; and (5) actual damages."[12] The plaintiff must prove all five elements of his claim to succeed in a tort action.[13]

The plaintiff asserted a claim against Williams for negligence based on Civil Code Article 2315 and also asserted a claim against Williams in its capacity as the owner of the platform under Louisiana Civil Code Article 2317, which addresses the duties owed by a person for things in its custody, and Article 2322, which addresses the duties owed by the owner of a building. Under these articles, an owner or

---

[11]      43 U.S.C. § 1333(a); *Union Texas Petroleum v. PLT Engineering, Inc.,* 895 F.2d 1043, 1047 (5th Cir. 1990).

[12]      *Christy v. McCalla*, 2011-0366 (La. 12/06/11) 79 So.3d 293, 299.

[13]      *Ogea v. Merritt*, 2013-1085 (La. 12/10/13), 130 So.3d 888, 901.

custodian of a thing is liable only if it is established that he knew of the condition that caused damage, the damage could have been prevented by the exercise of reasonable care, and the owner or custodian failed to exercise reasonable care.[14]

## C.    THE PLAINTIFF FAILED TO SHOW THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS WITH REGARD TO THE CLAIMS AGAINST WILLIAMS

Williams had no contract with Greene's and, assuming Williams owes a duty to keep its platform free from unreasonably dangerous conditions, the evidence is undisputed, and the plaintiff has presented nothing from which even a reasonable inference can be drawn, that would indicate that Williams breached any legal duty it might have owed to the plaintiff.

Williams had no personnel on the platform at any relevant time.  No Williams equipment was in any way involved in the plaintiff's accident.  There is no evidence that Williams knew about the crane access issue, the decision not to wait on the crane, or anything whatsoever involving the operation by Greene's on the day of the accident.

There is also no condition of the platform or any of its appurtenances that allegedly caused or contributed to the accident.  The plaintiff contends that the fact the platform had a derrick workover rig on it that belonged to yet another contractor,

---

[14]    Louisiana Civil Code Article 2317.1 and 2322.

Nabors, while Greene's was doing its operations somehow imposes liability on Williams, citing the opinion of the plaintiff's expert. However, that opinion does not change this Court's analysis. The accident occurred, based on the record before this Court, not because the cranes could not access the chicksan pipe the plaintiff was carrying, but because the cranes were not used at all during the rig down procedure. There is no evidence that the cranes did not have the ability to reach the particular piece of chicksan pipe the plaintiff was carrying at the time of his accident.

Therefore, the plaintiff has failed to demonstrate that there is any genuine issue of material fact as to whether Williams breached any duty it may have owed to the plaintiff, and Williams is entitled to judgment in its favor as a matter of law.

**D.    THE EVIDENCE ESTABLISHES THAT A GENUINE ISSUE OF MATERIAL FACT EXISTS AS TO ENI'S LIABILITY**

Under Louisiana law, one element essential to the plaintiff's recovery in a negligence action is the existence of a legal duty owed to the plaintiff by the alleged tortfeasor. "Whether a legal duty is owed by one party to another depends on the facts and circumstances of the case and the relationship of the parties. . . [W]here the alleged wrongful conduct of the defendant is a failure to act or 'nonfeasance', courts have found it necessary for some definite relationship between the parties to exist,

such that social policy justifies the imposition of a duty to act upon the defendant."[15] Whether a duty is owed is a question of law.[16]

Even though Eni did not have a contract with Greene's, as the OIM, Eni had ultimate work authority over all of the SIMOPS on Devil's Tower on May 18. This status included coordinating the use of access to the cranes which were essential to the safe operations of multiple contractors on the platform. Having assumed the duty of coordinating operations such that they could be conducted safely, Eni had a duty to act reasonably – and ultimately the evidence may show that they did. However, in drawing every inference in favor of the non-movant, the Court finds that there is a genuine issue of material fact as to who denied or delayed access to the crane once the rig down procedure became necessary, how long the delay was going to be, whether it was due to divers in the water or just an arbitrary denial by "the company," whether stop work authority was attempted and thwarted, and why there was no further coordination of operations by the OIM.

Therefore, Eni has failed to carry its burden of showing that it is entitled to judgment as a matter of law, and summary judgment in its favor is not warranted. For

---

[15]    *Fox v. Board of Supervisors of La. State Univ.,* 576 So.2d 978, 981 (La. 1991) (citations omitted).

[16]    *Lemann v. Essen Lane Daiquiris, Inc.*, 2005-CC-1095 (La. 03/10/06), 923 So.2d 627, 633.

the same reasons, the plaintiff has failed to carry his burden of showing that he is entitled to judgment as a matter of law, and he is also not entitled to summary judgment in his favor.

## CONCLUSION

For the foregoing reasons, and finding no genuine issues of material fact to be resolved, this Court finds that there is no evidence that defendant Williams Field Services Group, LLC is liable for the plaintiff's alleged accident and resulting injuries. Accordingly, the plaintiff's motion for summary judgment (Rec. Doc. 68) is DENIED to the extent that it addresses Williams's liability, the defendants' cross-motion for summary judgment (Rec. Doc. 79) is GRANTED to the extent that it addresses Williams's liability, and the plaintiff's claims against Williams are DISMISSED WITH PREJUDICE.

The Court finds there are genuine issues of material fact as to the liability of Eni US Operating Co. Inc. Therefore, the plaintiff's motion for summary judgment (Rec. Doc. 68) is DENIED with regard to Eni's liability, and the defendants' cross-motion for summary judgment (Rec. Doc. 79) is also DENIED with regard to Eni.

Signed at Lafayette, Louisiana on this 5th  day of April 2017.

PATRICK J. HANNA
UNITED STATES MAGISTRATE JUDGE

-14-